Janet Sabel, Attorney-in-Chief
Adriene Holder, Attorney-in-Charge, Civil Practice
Karen Cacace, Director, Employment Law Unit
Richard Blum, Of Counsel
**THE LEGAL AID SOCIETY**
199 Water Street, Fl. 3
New York, New York 10038
Telephone:  (212) 577-3648

Michael F. Autuoro, Esq.
Jeffrey C. Mok, Esq.
**FISH & RICHARDSON P.C.**
601 Lexington Avenue, 52nd Flr.
New York, NY 10022
Telephone:  (212) 765-5070
Fax:  (212) 258-2291

*Attorneys for Apolinar Acevedo*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Apolinar Acevedo, | : |
| Plaintiff, | : |
| | : Civil Action No.: |
| v. | : |
| Urban Management LLC; 21-25 Convent Ave. Realty LLC; 160-166 Morningside Ave. Realty LLC; and John Schroeder, | : **COMPLAINT** |
| Defendants. | : |
| | : JURY TRIAL DEMANDED |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PRELIMINARY STATEMENT

1.     Plaintiff Apolinar Acevedo brings this action to recover damages and other relief for violations of federal and state labor laws arising out of his employment as superintendent of two residential building sites: 21-25 Convent Avenue, New York, New  York ("*the Convent Site*") and 160-166  Morningside Avenue, New York, New York ("*the Morningside Site*").

2.      Defendants Urban Management LLC ("***Urban***"); 21-25 Convent Ave. Realty LLC ("***Convent Realty***"); and John Schroeder (collectively, "***the Convent Defendants***") employed Mr. Acevedo as a live-in building superintendent of the Convent Site from approximately January 2004 until his termination from employment on or about December 4, 2018.

3.      In addition, Defendants Urban; 160-166 Morningside Ave. Realty LLC ("***Morningside Realty***"); and John Schroeder (collectively, "***the Morningside Defendants***") employed Mr. Acevedo as superintendent of the Morningside Site from approximately January 2004 to about 2006, and then from approximately December 2014 until his termination from employment on or about December 4, 2018.

4.      Throughout his employment for Defendants, Defendants sent Mr. Acevedo to do work at a variety of locations where he was never the superintendent.

5.      During the course of his employment, Defendants violated numerous provisions of the Fair Labor Standards Act,  29 U.S.C. § 201, *et seq.* ("***the FLSA***") and the New York Labor Law, § 190, *et seq.* ("***the NYLL***") by (a) failing to pay Plaintiff any wages whatsoever for the hours he worked over 40 hours each week; (b) causing Plaintiff to pay for an assistant out of his own wages and taking other unlawful deductions from Plaintiff's pay; and (c) failing to provide Plaintiff with required legally-compliant wage statements.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and Section 216(b) of the FLSA.

7.      This Court has supplemental jurisdiction over Plaintiff's New York state law claims pursuant to 28 U.S.C. § 1367, because those claims are so closely related to Plaintiff's claims under the FLSA that they form part of the same case or controversy.

2

8.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred

in this District.

## PARTIES

9.      Plaintiff Apolinar Acevedo is a resident of the State of New York.

10.      Defendant Convent Realty is a limited liability company incorporated in New

York, with its principal office located at 161 Suffolk Street, New York, New York 10002.  Upon

information and belief, Convent Realty owns the Convent Site.

11.      Defendant Morningside Realty is a limited liability company incorporated in New

York, with its principal office located at 161 Suffolk Street, New York, New York 10002.  Upon

information and belief, Morningside Realty owns the Morningside Site.

12.      Upon information and belief, Defendant Urban is a limited liability company

incorporated in New York, with its principal office located at 161 Suffolk Street, New York,

New York 10002.  Urban issued Mr. Acevedo's W-2s and weekly paystubs.

13.      Upon information and belief, Defendant John Schroeder is an officer of Urban.

Mr. Schroeder hired and fired Mr. Acevedo, determined the scope of Mr. Acevedo's job, and

gave Mr. Acevedo work assignments, including through a supervisor.

14.      Upon information and belief, Defendants Convent Realty, Morningside Realty,

and Urban operated as a single real estate enterprise, under the ownership and/or control of

Michael and Jonathan Feigenbaum (a/k/a Faust), operated out of an office at 161 Suffolk Street

in Manhattan.  Upon information and belief, under the common management of John Schroeder,

these defendants assigned employees, including Mr. Acevedo, to the Convent or Morningside

Sites, or other sites, as needed.

15.      Upon information and belief, Defendants Convent Realty, Morningside Realty,

3

and Urban were, at all relevant times, enterprises engaged in commerce within the meaning of

the FLSA in that each Defendant (i) had employees engaged in commerce or in the production of

goods for commerce, or who handled, sold or otherwise worked on goods or materials that were

moved in or produced for commerce and (ii) had an annual gross volume of sales of not less than

$500,000.

## FACTS

**Mr. Acevedo's Hiring and Housing**

16.     In or about January 2004, Victor Santos, who upon information and belief is an

employee of Mr. Schroeder and Urban, introduced Mr. Acevedo to Mr. Schroeder as a

prospective employee.

17.     Shortly thereafter, Mr. Schroeder interviewed Mr. Acevedo to work as the live-in

superintendent of the Convent Site and the superintendent of the Morningside Site.

18.     Mr. Schroeder represented to Mr. Acevedo – and Mr. Acevedo understood – that

as superintendent he would be responsible for trash removal at both the Convent and

Morningside Sites, minor apartment repairs upon tenant request at both sites, and cleaning at

both sites with the assistance of a porter (collectively, Mr. Acevedo's "***superintendent work***" or

"***superintendent duties***").

19.     Mr. Schroeder represented to Mr. Acevedo – and Mr. Acevedo understood – that

the job entailed working 8am to 4pm, Monday through Friday, for a total of 40 hours per week,

for which he would be compensated with a weekly $400 payment and rent-free housing.

20.     Mr. Schroeder represented to Mr. Acevedo – and Mr. Acevedo understood – that

he would be assisted in his duties by a porter.

21.     At the conclusion of the interview, or shortly thereafter, Mr. Schroeder offered

Mr. Acevedo the position for which he interviewed – live-in superintendent of the Convent Site

and superintendent of the Morningside Site.

22.     Upon information and belief, all Defendants directed and/or facilitated Mr. Schroeder's hiring of Mr. Acevedo.

23.     In or about January 2004, on the understandings and representations described in the above paragraphs, Mr. Acevedo accepted Mr. Schroeder's job offer and moved into an above-ground apartment at the Convent Site. Shortly thereafter, Mr. Schroeder required Mr. Acevedo to move out of the above-ground apartment at the Convent Site and into an apartment in the basement of the Convent Site, where he lived until his termination from employment.

**Mr. Acevedo's Work for Defendants from Hiring until about 2006**

24.     From the time Mr. Acevedo was hired until about 2006, he was assisted by a porter. Upon information and belief, some or all Defendants employed the porter while he was assisting Mr. Acevedo.

25.     Throughout Mr. Acevedo's employment with Defendants, Mr. Schroeder required Mr. Acevedo to work on both weekdays and weekends in addition to his regular 40 hours and his regular superintendent duties. This additional work (collectively, Mr. Acevedo's "***extra work***" or "***extra duties***") included apartment painting, major apartment repairs, removal of lead paint and mold, other projects in response to court violations, and emergency building maintenance.

26.     Throughout Mr. Acevedo's employment with Defendants, Mr. Schroeder required Mr. Acevedo to do extra work at both the Convent and Morningside Sites and at other sites as well.

27.     Throughout Mr. Acevedo's employment with Defendants, he worked more hours per week from approximately November 1 through April 30 than from approximately May 1 through October 31, because November 1 through April 31 is "heating season."  Whenever the boiler broke down at a site to which he was assigned, which was a frequent event, Mr. Acevedo

was required to immediately attempt to repair the boiler, even in the middle of the night.  If his attempts were unsuccessful, he was required to call John Schroeder to call a mechanic and he had to wait for the mechanic to arrive and to stay with the mechanic while he was at the site. This type of extra work, among other tasks, such as snow removal, was considered his "emergency extra work."

28.     With limited exceptions at the end of his employment with Defendants, Mr. Acevedo was never compensated for any of his emergency extra work, such as boiler repair, at any point during his employment with any Defendant.  Mr. Acevedo was never paid for snow removal work that he did at different hours of the day and night, during the week and on weekends.

29.     Throughout Mr. Acevedo's employment with Defendants, the process by which Mr. Acevedo was assigned and compensated for all non-emergency extra work, such as apartment painting and major apartment repair, is as follows: Mr. Schroeder or his staff would alert Mr. Acevedo of the additional work assignment. Mr. Acevedo would then do the work, and Mr. Schroeder or his staff would provide Mr. Acevedo a form on which to describe what he had done. Mr. Acevedo would then return the form to Mr. Schroeder or his staff. Mr. Schroeder would then determine how much to pay Mr. Acevedo for that extra work.

30.     On occasion, Mr. Acevedo would write on the form how much he felt he should be paid, to which Mr. Schroeder would respond by scolding Mr. Acevedo to the effect of, "I set the prices, not you," and by crossing out Mr. Acevedo's requested dollar amount. Urban would pay Mr. Acevedo for the extra work, in the dollar amount unilaterally established by Mr. Schroeder. Mr. Acevedo has never been told the basis for Mr. Schroeder's determinations for how much to pay him for this extra work.

6

31.     Throughout Mr. Acevedo's employment with Defendants, the number of hours that Mr. Acevedo worked in a week had little or no bearing on the amount that he was compensated for his extra work.

32.     When he began his employment with Defendants, Mr. Acevedo was told that he would not be paid for his first week of work until he left Defendants' employ.  Defendants never paid him for that week.

33.     In or about 2006, the porter was fired. Mr. Acevedo told Mr. Schroeder that he could not work as the superintendent of both the Convent and Morningside Sites without the assistance of a porter, as it was too much work for one person. In response, Mr. Schroeder relieved Mr. Acevedo of his regular duties at the Morningside Site and made a different employee superintendent of the Morningside Site.

**Mr. Acevedo's Work for Defendants from about 2006 through about November 2014**

34.     Mr. Acevedo continued to work as live-in superintendent of the Convent Site, and not as the superintendent of the Morningside Site, from approximately the time of the porter's departure, in or about 2006, through about November 2014.

35.     During this period, Mr. Schroeder required Mr. Acevedo to do extra work and emergency extra work at the Convent Site.   During this period, Mr. Schroeder would also send Mr. Acevedo to do extra work and emergency extra work, such as snow removal, at the Morningside Site and other sites.

36.     During this period, Mr. Acevedo typically worked at least 70 hours per week (aside from emergency extra work), a substantial portion of which was spent doing extra work at the Convent and Morningside Sites and other sites.  On a typical weekday, Mr. Acevedo would work from about 6 a.m. to between 6 or 7 p.m.  After cleaning his buildings in the morning, he

would typically do extra work at the Convent and Morningside Sites or other sites for at least

seven hours, before returning to superintendent work and extra work at night at the Convent Site.

37.     In addition he would work on both Saturdays and Sundays.  On Saturdays, he

would typically work from about 6 or 7 a.m. to 12 or 1 p.m.  On Sundays, he would typically

work from about 9 a.m. to 12 or 1 p.m.  He would do both superintendent work and extra work at

the Convent Site on weekends.  On top of all of this, he performed emergency extra work at the

Convent Site, on both weekdays and weekends.

38.     In addition, Mr. Acevedo routinely performed emergency extra work, particularly

in the heat season months, from approximately November through April.  During the heat season

months, it was common for Mr. Acevedo not to get five uninterrupted hours of sleep once or

more times per week, because he would have to fix the boiler common to the Convent Avenue

buildings.

39.     During this period, Urban compensated Mr. Acevedo as follows: Mr. Acevedo

was provided with a rent-free two-bedroom apartment in the basement of the Convent Site, a

weekly $400 direct deposit payment for his regular forty hour work week at the Convent Site,

and, in weeks in which he did non-emergency extra work, a payment for that work through the

process described in the above paragraphs.

40.     Defendants deducted pay from Mr. Acevedo's payments to reimburse themselves

for tickets received from the city.

**Mr. Acevedo's Work for Defendants from about late 2014 to about 2016**

41.     In or about late 2014, the superintendent of the Morningside Site stopped working

at that site. As a result, Mr. Schroeder reinstated Mr. Acevedo as the superintendent of the

Morningside Site while also requiring him to retain his position as live-in superintendent of the

Convent Site.

42.     This was done over Mr. Acevedo's repeated protests to Mr. Schroeder that being

superintendent of both the Morningside and Convent Sites, without the assistance of a porter,

was too much work for one person.  Mr. Schroeder responded that he could either do the work or

quit.  For about one month, Mr. Schroeder told Mr. Acevedo that he was let go until he would

decide to accept superintendent duties for the two sites.  Faced with this choice, Mr. Acevedo

finally agreed to work as the superintendent of both sites.

43.     From then to about 2016, Mr. Schroeder required Mr. Acevedo to do extra work

and emergency extra work at both the Convent and Morningside Sites.

44.     During this period, Mr. Schroeder also required Mr. Acevedo to do extra work

and emergency extra work at other sites.

45.     During this period, Mr. Acevedo typically worked approximately 90 hours per

week, a substantial portion of which was spent doing extra work at the Convent and Morningside

Sites and other sites.  On a typical weekday, Mr. Acevedo would work from about 6 a.m. to

between 8 and 11 p.m.  After cleaning his buildings in the morning, he would typically do extra

work at the Convent and Morningside Sites or other sites for at least seven hours, before

returning to superintendent work and extra work at night at Convent and Morningside Sites.

46.     In addition he would work on both Saturdays and Sundays.  On Saturdays, he

would typically work from about 6 or 7 a.m. to 2 to 3 p.m.  On Sundays, he would typically work

from about 9 a.m. to 2 p.m.  He would do both superintendent work and extra work at the

Convent and Morningside Sites on weekends.  On top of all of this, he performed emergency

extra work at the Convent and Morningside Sites and other sites, on both weekdays and

weekends.

47.     During the heat seasons, it was common for Mr. Acevedo not to get five uninterrupted hours of sleep once or more times per week, because he would have to fix the boiler at the Convent Avenue or Morningside Sites.

48.     During this period, Urban compensated Mr. Acevedo as follows: Mr. Acevedo was provided with a rent-free two-bedroom apartment in the basement of the Convent Site, a weekly $400 payment for his regular 40 hour week at the Convent Site, a weekly $200 payment for his work at the Morningside Site, and, in weeks in which he did non-emergency extra work, sometimes a payment for that work through the process described in the above paragraphs.

49.     His weekly paystubs stated that he was paid $400 for 40 hours of work per week. The paystubs did not include hour amounts for the $200 payments or the extra work payments.

50.     Defendants deducted pay from Mr. Acevedo's payments to reimburse themselves for tickets received from the city. Also, although Mr. Schroeder required Mr. Acevedo to use Mr. Acevedo's internet service for the Convent Site's security cameras, he only reimbursed Mr. Acevedo once for the internet service.

51.     During this period, on several occasions, Mr. Acevedo attempted to turn down extra work because he was so busy. Each time, Defendant Schroeder said to Mr. Acevedo something to the effect of: "Do it or you're fired." Mr. Acevedo always did the work.

**Mr. Acevedo's Work for Defendants from about 2016 until his Termination from Employment on or about December 4, 2018**

52.     In or about 2016, Jose Rodrigues, a friend of Mr. Acevedo, began to assist him with his superintendent duties at both sites, upon information and belief, with the knowledge of Mr. Schroeder.

53.     Thereafter, until Mr. Acevedo's termination from employment, Mr. Acevedo paid Mr. Rodrigues $150 in cash from his own wages each week, except for the few weeks in which

Mr. Acevedo was on vacation.

54.     When Mr. Acevedo would take four weeks of vacation, Mr. Schroeder would pay
Mr. Acevedo for six weeks.   Upon information and belief, Mr. Schroeder paid for six weeks
with the understanding that four of the weeks pay would go to Mr. Rodrigues who covered for
Mr. Acevedo.  Mr. Schroeder told Mr. Acevedo that he would not pay Mr. Rodrigues directly,
because he did not want another employee on payroll but that Mr. Acevedo had to arrange for
someone to cover for him before going on vacation.

55.     All other weeks, Mr. Acevedo paid Mr. Rodrigues $150 out of his own pocket
and upon information and belief, Defendants did not pay Mr. Rodrigues anything else.  Mr.
Acevedo was not reimbursed by the Defendants for the payments he made to Mr. Rodrigues. Mr.
Rodrigues moved into a spare room in Mr. Acevedo's Convent Site basement apartment.

56.     During this period when Mr. Rodrigues was assisting him, Mr. Acevedo generally
worked a similar schedule as before, except that he would finish approximately two hours less
each day compared to before Mr. Rodrigues had joined him.  Mr. Acevedo's amount of
emergency extra work continued to be approximately the same. During the heat season, it was
common for Mr. Acevedo not to get five uninterrupted hours of sleep once or more times per
week, because he would have to fix the boiler at the Convent or Morningside Sites.

57.     During this period, except for vacation pay, Urban compensated Mr. Acevedo as
follows: Mr. Acevedo was provided with a rent-free two-bedroom apartment in the basement of
the Convent Site, a weekly $400 payment for his regular 40 hour week at the Convent Site, a
weekly $200 payment for his work at the Morningside Site, and, in weeks in which he did non-
emergency extra work, sometimes a payment for that work through the process described in the
above paragraphs.

58.      His weekly paystubs stated that he was paid $400 for 40 hours of work per week. The paystubs did not include hour amounts for the $200 payments or the extra work payments.

59.      Although Mr. Schroeder required Mr. Acevedo to use Mr. Acevedo's internet service for the Convent Site's security cameras, he did not reimburse Mr. Acevedo once for the internet service during this period.

60.      On or about December 4, 2018, Mr. Schroeder terminated Mr. Acevedo from employment.

**Defendants' Recordkeeping Practices**

61.      Upon information and belief, each Defendant failed to maintain adequate and accurate written records of the hours worked by Mr. Acevedo and the conditions and practices of his employment.

62.      Each week of Mr. Acevedo's employment, the paystubs Urban provided to him falsely represent that he worked only 40 hours in that week.

## CLAIMS FOR RELIEF

### I.      Unpaid Minimum Wage under the FLSA

63.      Plaintiff repeats and re-alleges paragraphs 1 through 62 as if fully set forth herein.

64.      From about January 2004 to about December 4, 2018, Defendants failed to pay Mr. Acevedo any wages whatsoever for the hours he worked in excess of 40 hours per week, in violation of the FLSA, 29 U.S.C. § 201, *et seq*. and regulations promulgated thereunder.

65.      Such violations were willful and not in good faith.

### II.      Unpaid Overtime under the FLSA

66.      Plaintiff repeats and re-alleges paragraphs 1 through 62 as if fully set forth herein.

67.      From about January 2004 to about December 4, 2018, Defendants failed to pay Mr. Acevedo any wages whatsoever for the hours he worked in excess of 40 hours per week, in

violation of the FLSA and regulations promulgated thereunder.

68.     Such violations were willful and not in good faith.

**III.    Unpaid Minimum Wage under the NYLL**

69.     Plaintiff repeats and re-alleges paragraphs 1 through 62 as if fully set forth herein.

70.     From about January 2004 to about December 4, 2018, Defendants failed to pay Mr. Acevedo any wages whatsoever for the hours he worked in excess of 40 hours per week, in violation of the NYLL, § 190, *et seq.* and 12 NYCRR § 141-1.3, even though he generally performed at least 12 hours per week doing "extra work" that falls outside of the scope of the work for which "janitors" of residential property are compensated, 12 NYCRR § 141-2.5(b) and 141-2.11 and even though he routinely performed work at sites where he was not the "janitor."

71.     Such violations were willful and not in good faith.

**IV.    Unpaid Overtime under the NYLL**

72.     Plaintiff repeats and re-alleges paragraphs 1 through 62 as if fully set forth herein.

73.     From about January 2004 to about December 4, 2018, Defendants failed to pay Mr. Acevedo any wages whatsoever for the hours he worked in excess of 40 hours per week, in violation of the NYLL, § 190, *et seq.* and 12 NYCRR § 141-1.4, even though he generally performed at least 12 hours per week doing "extra work" that falls outside of the scope of the work for which "janitors" of residential buildings are compensated, 12 NYCRR § 141-2.5(b) and 141-2.11, and even though he routinely performed work at sites at which he was not the "janitor."

74.     Such violations were willful and not in good faith.

**V.    Illegal Deduction under the NYLL**

75.     Plaintiff repeats and re-alleges paragraphs 1 through 62 as if fully set forth herein.

13

76.     From about 2016 to about December 4, 2018, Defendants effectively deducted $150 per week from Plaintiff's wages by causing him to hire a third party – Jose Rodrigues – to assist him in his employment duties, in violation of NYLL § 193 and 12 NYCRR § 142-2.10.

77.     In addition, Defendants deducted pay from Mr. Acevedo's wages to compensate themselves for payments to satisfy municipal tickets.

78.     In addition, Defendants failed to reimburse Mr. Acevedo for the cost of internet service that they required him to connect to the security camera system at the Convent Site.

79.     Such violations were willful and not in good faith.

**VI.     Wage Statement Violations under the NYLL**

80.     Plaintiff repeats and re-alleges paragraphs 1 through 62 as if fully set forth herein.

81.     Effective April 9, 2011, NYLL § 195(3) required Defendants to provide Plaintiff with a statement, with every payment of wages, listing, among other things, "rate or rates of pay and basis thereof," "the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked."

82.     Each week, from April 9, 2011 until about December 4, 2018, Defendants failed to provide Mr. Acevedo with all of the written information required by NYLL § 195(3) and 12 NYCRR § 142-2.7. The information Defendants did provide falsely represented that Plaintiff worked only 40 hours in that week in violation of NYLL § 195(3) and 12 NYCRR § 142-2.7.

83.     Such violations were willful and not in good faith.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a.      Declare that Defendants violated the minimum wage provisions of the FLSA, declare that such violations were not in good faith and were willful, and award Plaintiff backpay and liquidated damages, and any other relief authorized under the FLSA;

b.      Declare that Defendants violated the overtime provisions of the FLSA, declare that such violations were not in good faith and were willful, and award Plaintiff unpaid premium overtime, liquidated damages, and any other relief authorized under the FLSA;

c.      Declare that Defendants violated the minimum wage provisions of the NYLL and New York Department of Labor Regulations, that such violations were not in good faith and were willful, and award Plaintiff backpay and liquidated damages and any other relief authorized under the NYLL;

d.      Declare that Defendants violated the overtime provisions of the NYLL and New York Department of Labor Regulations, that such violations were not in good faith and were willful, and award Plaintiff unpaid premium overtime, liquidated damages, and any other relief authorized under the NYLL;

e.      Declare that Defendants violated NYLL § 193 and 12 NYCRR § 141-2.10, that such violations were not in good faith and were willful, and award Plaintiff deducted wages, liquidated damages, and any other relief authorized under the NYLL;

f.      Declare that Defendants violated NYLL § 195(3) and 12 NYCRR § 141-2.2, and award Plaintiff $5,000;

g.      Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 29 U.S.C. § 216(b) and NYLL §§ 198(1-b), 198(1-d), and 663;

h.      Award Plaintiff pre-judgment interest to the extent allowed by law; and

i.      Award Plaintiff such other relief as the Court deems just and proper.

Plaintiff demands a trial by jury.


Dated:  October 11, 2019

> _/s/Jeffrey C. Mok_
> Janet Sabel, Attorney-in-Chief
> Adriene Holder, Attorney-in-Charge, Civil Practice
> Karen Cacace, Director, Employment Law Unit
> Richard Blum, Of Counsel
> THE LEGAL AID SOCIETY
> 199 Water Street, Fl. 3
> New York, New York 10038
> Telephone:  (212) 577-3648
>
> Michael F. Autuoro, Esq.
> Jeffrey C. Mok, Esq.
> FISH & RICHARDSON P.C.
> 601 Lexington Avenue, 52nd Flr.
> New York, NY 10022
> Telephone:  (212) 765-5070
> Fax:  (212) 258-2291
> autuoro@fr.com
> jmok@fr.com
>
> _Attorneys for Apolinar Acevedo_